**Guy DeMARCO, Plaintiff,**

v.

**HOLY CROSS HIGH SCHOOL, Defendant.**

No. CV–91–2551 (ADS).

United States District Court, E.D. New York.

July 17, 1992.

Jerome J. Liebman, Rockville Centre, N.Y., for plaintiff.

Faruolo, Caputi, Weintraub & Neary, Huntington, N.Y., for defendant (Brian P. Neary, of counsel).

## MEMORANDUM DECISION AND ORDER

SPATT, District Judge.

This is an employment discrimination case, brought pursuant to the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq. ("ADEA"). The plaintiff Guy DeMarco ("DeMarco"), alleges that the defendant, Holy Cross High School ("Holy Cross") discharged him from employment in violation of ADEA. The defendant Holy Cross now moves for summary judgment on the ground that it is not subject to ADEA. In the alternative, the defendant argues that if ADEA is found to be applicable to the instant action, such application would violate the Free Exercise Clause and the Establishment Clause of the First Amendment to the United States Constitution. The defendant also contends that the plaintiff failed to exhaust administrative remedies pursuant to 29 U.S.C. § 633(b).

In essence, the summary judgment motion of the defendant Holy ·Cross is an exemption request. Holy Cross argues that if it is subject to ADEA, ultimately the law's operation will impermissibly involve the religious philosophy of Holy Cross.

The question presented by the summary judgment motion of Holy Cross, that is, whether ADEA applies to a parochial educational institution, appears to be a matter of first impression in the Second Circuit.

## BACKGROUND

Holy Cross is a Catholic high school with a student body of approximately 1,000 students. It was founded by the Brothers of Holy Cross in 1955, and they have operated the school since its inception.

By contract dated August 24, 1985, DeMarco became employed as a math teacher with the defendant. He was also called upon, in the course of his employment, to teach mechanical drawing. DeMarco is forty-nine years of age.

The yearly contract between the parties was renewed each year from 1985. DeMarco would be eligible for tenure after five years employment with the school. Prior to his completing his five year tenure eligibility, by letter dated April 12, 1990, DeMarco was notified by the Executive Committee of Holy Cross that he would not be offered a contract for the upcoming school year. Thereafter, DeMarco lodged an age discrimination claim with the Equal Employment Opportunity Commission. By decision dated April 22, 1991, it was determined that the plaintiff's age discrimination claim lacked merit. On June 12, 1991, DeMarco commenced this action.

### The Holy Cross Philosophy

Holy Cross is a religious educational institution. As set forth in the section of the faculty handbook entitled the "Mission Statement," the "ultimate aim [of the school] is to educate the students that he or she will grow into that maturity which is necessary to make decisions in the light of the Christian vision of redemption" (Damato Aff. ¶ 10). Based on the faculty handbook, it is clear that in addition to their secular responsibilities, teachers at Holy Cross are expected to participate in religious activities as well.

The philosophical statement in the faculty handbook provides in pertinent part as follows:

"With the acknowledgment of the increasing complexities of modern life, Holy Cross, as a Catholic educational institution, exists to provide traditional values.... We believe that to become a whole person the Holy Cross student needs to develop spiritually, intellectually, personally, socially and physically.... We believe that the spiritual development of the Holy Cross Community is directed towards the formation of a Christian who is morally strong...." (Damato Aff. ¶ 11).

The relevant objectives set forth in the faculty handbook are as follows:

"1. To hand on the tradition, gospel message and teaching of the Catholic Church.

2. To provide for the development of a spiritual life and Christian identity based on the person of Jesus Christ.

3. To provide experiences of the worshipping and apostolic faith community. . . .

7. To provide adequate preparation for further academic study and for the development of a Christian philosophy of life" (Holy Cross Faculty Handbook, p. 4).

The faculty handbook contains other provisions as to the teacher's role as a spiritual leader and instructor. For example, teachers are required to attend Mass with their students when classes are cancelled for Mass. Furthermore, the faculty handbook provides that teachers are to "begin [each] class with a prayer" (Damato Aff. ¶ 13; Faculty Handbook at p. 13).

The plaintiff, DeMarco, was allegedly denied tenure and discharged from his employment with Holy Cross, for his periodic failure to begin each class with a prayer and for his failure to attend Mass with his students, in addition to other allegedly non-discriminatory reasons. However, DeMarco contends that he was unlawfully discharged on the basis of his age.

Although Holy Cross denies that it engaged in any such discrimination, it contends that as a religious educational institution it is exempt from the application of ADEA.

### THE LAW

a. *Summary Judgment Standard*

 Summary judgment shall be granted in favor of a party if it is demonstrated that there are no genuine issues of material fact for trial, and that the movant is entitled to judgment as a matter of law (*see* Fed.R.Civ.P. 56[c]; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 [1986]). The Court must, however, resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion (*see Liscio v. Warren*, 901 F.2d 274, 276 [2d Cir.1990]; *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 [2d Cir.1986], *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 [1987]). Once a party moves for summary judgment, in order to avoid the granting of the motion, the non-movant must come forward with specific facts showing that a genuine issue for trial exists (*see National Union Fire Ins. Co. v. Turtur*, 892 F.2d 199, 203 [2d Cir.1989]). However, mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment (*see Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 [2d Cir.1990]). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable (*see Rattner v. Netburn*, 930 F.2d 204, 209 [2d Cir.1991]). Finally, the Court is charged with the function of "issue finding", not "issue resolution" (*Eye Assocs., P.C. v. Incomrx Sys. Ltd. Partnership*, 912 F.2d 23, 27 [2d Cir.1990]).

b. *The Age Discrimination in Employment Act*

ADEA makes it unlawful for an employer to

"fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age" (29 U.S.C. § 623[a][1]).

An "employer" is defined as "a person engaged in an industry affecting commerce who has twenty or more employees" (29 U.S.C. § 630[b]). The statute and its legislative history are silent as to whether religious institutions are within the definition of "employer" (*see* H.R.Rep. No. 805, 90th Cong., 1st Sess. *reprinted in* 1967 U.S.Code & Cong.Admin.News. pp. 2213 *et seq.;* S.Rep. No. 723, 90th Cong., 1st Sess. [1967]).

c. *The First Amendment*

The Free Exercise and Establishment Clauses of the First Amendment, which

have been made applicable to the States by incorporation through the Fourteenth Amendment, provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." (United States Const. Amend. I). "These clauses have been interpreted as providing full protection for religious beliefs but only limited protection for overt acts prompted by those beliefs" (*Intercommunity Center For Justice and Peace v. Immigration and Naturalization Service*, 910 F.2d 42, 44 [2d Cir.1990]).

Justice Scalia has characterized the essence of the free exercise of religion as "first and foremost, the right to believe and profess whatever religious doctrine one desires" (*Employment Div., Dept. of Human Resources v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 1599, 108 L.Ed.2d 876 [1990]).

However, the United States Supreme Court "has never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the [government is] free to regulate" (*Smith, supra*, 110 S.Ct. at p. 1600).

For example, in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), the Court applied free exercise principles in developing a balancing test which requires the government to establish a compelling interest in any action that substantially burdens a religious practice (*Sherbert, supra*, at pp. 402–403, 83 S.Ct. at pp. 1792–1793; *see also Smith, supra*, at p. 1602). In *Sherbert*, the Court, as it has on a number of subsequent occasions, invalidated a state unemployment compensation law that conditioned the availability of benefits upon the individual's acceptance of work in contravention of his religions beliefs (*see Smith, supra*, at p. 1602).

The Establishment Clause prohibits government sponsorship of religion. In the view of the Supreme Court, this clause has come to mean that the "government may not promote or affiliate itself with any religious doctrine or organization, may not discriminate among persons on the basis of their religious beliefs and practices, may not delegate a governmental power to a religious institution, and may not involve itself too deeply in such an institution's affairs" (*County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 109 S.Ct. 3086, 3099, 106 L.Ed.2d 472 [1989]). So while the Free Exercise Clause protects citizens from the government's opposition to a religion, the Establishment Clause protects the citizenry from governmental imposition or endorsement of a religion.

The Supreme Court enunciated a three part test to guide judicial inquiries as to whether a particular government action constitutes an endorsement of a religion. In *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Supreme Court stated:

"[e]very analysis in this area must begin with consideration of the cumulative criteria developed by the Court over many years.... First, the statute must have a secular legislative purpose; second; its principal or primary effect must be one that neither advances nor inhibits religion; [and] finally, *the statute must not foster 'an excessive government entanglement with religion'* " (*Lemon, supra*, at p. 613–14, 91 S.Ct. at 2111–12 [citations omitted] [emphasis supplied]).

While the so-called *"Lemon* test" apparently has continued viability in the current Supreme Court, the "test" has been questioned and subjected to criticism by the present Court (*see e.g., Board of Educ. of Westside Community Schools v. Mergens*, 496 U.S. 226, 110 S.Ct. 2356, 2376, 110 L.Ed.2d 191 [1990] [Kennedy, Scalia, JJ., concurring in part, concurring in judgment]; *County of Allegheny, supra*, 109 S.Ct. at p. 3134 [Kennedy, J., Rehnquist, C.J., White and Scalia, JJ. concurring in judgment, dissenting in part] ["Substantial revision of our Establishment Clause doctrine may be in order"]). Further, Justice Blackmun, writing for the Court, expressed the difficulty in attempting to sum up Establishment Clause principles noting that " 'the myriad, subtle ways Establishment Clause values can be eroded' are not susceptible to a single verbal formulation...."

**1146**

(*County of Allegheny, supra*, at p. 3099 [citations omitted]).

### d. NLRB v. Catholic Bishop

Cases arising under the Establishment and Free Exercise Clauses represent the two major streams of Constitutional doctrine in the area of religious rights. Yet there is another line of Religion Clause cases, which appears to have developed, perhaps in part due to the difficulty in expressing certain First Amendment principles, as noted by Justice Blackmun in the *County of Allegheny* decision. These cases represent a particular type of First Amendment challenge, based on a principle of statutory construction, which, according to the defendant, applies in this case.

The leading case in this vein, *N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), was a 5–4 decision in which the Supreme Court held that the National Labor Relations Board ("NLRB") was not authorized by the National Labor Relations Act ("NLRA") to regulate the unionization of lay faculty at schools affiliated with the Roman Catholic Church.

In *Catholic Bishop*, the Court rejected the NLRB's policy of declining to take jurisdiction over "religiously sponsored organizations only when they [were] completely religious, and not just religiously associated" (*Catholic Bishop, supra*, at p. 493, 99 S.Ct. at 1315). The Court held that schools operated by a church which teaches both religious and secular subjects were not within the jurisdiction of the NLRA. In so doing, the Court affirmed a decision of the Seventh Circuit, which was guided in its analysis by the prior decision of the Supreme Court in *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

The Seventh Circuit found that the NLRB's "completely religious/religiously associated" dichotomy provided no standard of demarcation for the exercise of the Board's discretion. Analyzing this policy under the Religion Clauses of the First Amendment, the Seventh Circuit determined that at some point, agency or court involvement would "necessarily raise First Amendment problems" (*Catholic Bishop v. N.L.R.B.*, 559 F.2d 1112, 1118 [7th Cir. 1977]). The Seventh Circuit determined that the Religion Clauses precluded any effective accommodation between the exercise of the NLRB's jurisdiction and the plaintiff's First Amendment rights. Therefore, the court concluded that the NLRB could not exercise its jurisdiction over religiously affiliated schools.

On appeal, the Supreme Court also held that the NLRB was without jurisdiction over religiously affiliated schools, but avoided the constitutional issue addressed by the Seventh Circuit. The Supreme Court parted from the analysis of the Seventh Circuit, adhering to the general principle that "an Act of Congress ought not to be construed to violate the Constitution if any other possible construction remains available" (*Catholic Bishop*, 440 U.S. at p. 500, 99 S.Ct. at 1318). In keeping with this principle, the Court established the following analytical framework: If "the Board's exercise of jurisdiction ... would give rise to *serious constitutional questions* ... [then the Court] must.... first identify 'the affirmative intention of the Congress clearly expressed' before concluding that the Act grants jurisdiction" (*Catholic Bishop, supra*, at p. 506, 99 S.Ct. at p. 1322 [emphasis supplied]).

As to whether serious constitutional questions were implicated by the Board's exercise of jurisdiction, the Court found guidance in its decision in *Lemon v. Kurtzman, supra*. The *Catholic Bishop* Court focused on the third prong of the *Lemon* test and considered whether the Board's exercise of jurisdiction would involve it in an excessive entanglement in the affairs of the church operated schools at issue. However, the Court made clear that its analysis did not rise to the level of a constitutional determination. Instead, the Court stated that for purposes of this analysis "we make a narrow inquiry whether the exercise of the Board's jurisdiction presents a significant risk that the First Amendment will be infringed" (*Catholic Bishop, supra*, at p. 502, 99 S.Ct. at p. 1319). In particu-

lar, the Court expressed concern that the exercise of jurisdiction would have necessarily involved determinations made by the Board into the good faith position of the clergy-administrators and its relationship to a school's religious mission. The Court noted that it was not "only the conclusions that may [have been] reached by the Board which may impinge on rights guaranteed by the Religion Clauses, *but also the very process of inquiry leading to findings and conclusions*" (*Catholic Bishop, supra,* at p. 502, 99 S.Ct. at p. 1320 [emphasis supplied]). For example, in the context of certain labor practices that were charged against religious schools, the "schools had responded that their challenged actions were mandated by their religious creeds" (*id.* at 502, 99 S.Ct. at 1320).

After concluding that the Board's exercise of jurisdiction would raise serious First Amendment questions, the Court considered the legislative history of the NLRA to determine whether it affirmatively conferred on the Board jurisdiction over religious schools. Only if there was an affirmative conferral of jurisdiction would the Court have decided whether the Board's exercise of such jurisdiction violated the Religion Clauses. Finding no clear congressional intent on the issue of whether teachers in church operated schools were to be covered by the NLRA, the Court declined to construe the NLRA in a manner so as to call upon the Court to actually resolve the First Amendment questions engendered by the Board's attempted exercise of jurisdiction. Thus the Court avoided the question of whether the exercise of such jurisdiction would violate the First Amendment. It simply held that church operated schools which teach both secular and religious subjects are not within the ambit of the NLRA's jurisdiction.

The principle of construction enunciated in *Catholic Bishop* is well entrenched in Supreme Court doctrine. In *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council,* 485 U.S. 568, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988), writing for a unanimous Court, Justice White stated that this rule of statutory construction is a "cardinal principle [which]

has its roots in Chief Justice Marshall's opinion for the Court in *Murray v. The Charming Betsy,* 2 Cranch 64, 118, 6 U.S. 64, 2 L.Ed. 208 (1804), and has for so long been applied by this Court that it is beyond debate" (*DeBartolo, supra,* at p. 575, 108 S.Ct. at p. 1397; *see also, Mergens, supra,* 110 S.Ct. at p. 2390 n. 20 [Stevens, J. dissenting], [suggesting that the legislation at issue presents ambiguity so as to invoke the *Catholic Bishop* doctrine in order to avoid the constitutional issue]; *Caplin & Drysdale, Chartered v. United States,* —— U.S. ——, 109 S.Ct. 2667, 2671 n. 11, 105 L.Ed.2d 528 [1989] ["even the broadest statutory language may be interpreted as excluding cases that would raise serious constitutional questions, absent a clear expression of an affirmative intention of Congress to include those cases"]).

While the rule of construction expressed in *Catholic Bishop* has been implemented to protect values inherent in the separation of church and state, the Court has indicated that in some circumstances it will permit some state intrusion into the employment practices of religious schools.

In *Ohio Civil Rights Comm'n. v. Dayton Christian Schools, Inc.,* 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986), representatives of a religious school brought a civil rights action against the Ohio Civil Rights Commission based on the Free Exercise and Establishment Clauses of the First Amendment. The school sought to enjoin the Commission from exercising jurisdiction over a complaint of gender discrimination brought against the school by a teacher. The discrimination claim was predicated on the school's decision not to rehire for a succeeding term a pregnant schoolteacher on the basis that the school's "religious doctrine [stated] that mothers should stay with their preschool age children" (*Dayton Christian Schools, supra,* at p. 623, 106 S.Ct. at p. 2720).

At the District Court, the plaintiff's complaint seeking declaratory and injunctive relief was dismissed. The Sixth Circuit Court of Appeals reversed and determined that given the broad scope of application "[e]ven under the analysis of *Catholic*

*Bishop*" it could not avoid considering the First Amendment implications at issue (*see Dayton Christian Schools v. Ohio Civil Rights Comm'n*, 766 F.2d 932, 944 [6th Cir.1985] ). It further determined that allowing the state Commission to assert jurisdiction over the teacher's employment discrimination claim would result in the state's excessive entanglement in matters of religion, and therefore, would violate the First Amendment (*id.* at p. 961).

■ The Supreme Court affirmed in part, but held that the District Court should have abstained from hearing the matter under the doctrine of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) (*see Dayton Christian Schools, supra*, 477 U.S. at p. 626, 106 S.Ct. at p. 2722). *Younger* stands for the proposition that federal courts should not enjoin pending proceedings in state courts when important state interests are at stake. The Court did not address whether the state has the power to subject religious institutions to gender discrimination laws in employment. However, the Court stated that "[e]ven religious schools cannot claim to be virtually free from some state regulation" (*Dayton Christian, supra*, at p. 628, 106 S.Ct. at 2723).

The *Dayton Christian* decision does not directly impact on *Catholic Bishop* and the issue before this Court. It addressed a constitutional attack on a state administrative procedure rather than a federal law. However, it indicates that the Supreme Court would permit some state regulation of a religious institution's employment practices.

e. *Catholic Bishop in the Second Circuit*

The *Catholic Bishop* doctrine was first followed by the Second Circuit in *N.L.R.B. v. Bishop Ford Cent. Catholic High School*, 623 F.2d 818 (2d Cir.1980) *cert. denied*, 450 U.S. 996, 101 S.Ct. 1698, 68 L.Ed.2d 196 (1981). The *Bishop Ford* Court held that the NLRB did not have jurisdiction over the defendant church operated school. The Court noted that "[i]t is the suffusion of religion into the curriculum and the mandate of the faculty to infuse the students with the religious values of a religious creed which create the conflict with the Religion Clauses...." (*Bishop Ford, supra*, at p. 823; *see also Christ the King Regional High School v. Culvert*, 815 F.2d 219, 223 [2d Cir.1987] ).

In *Catholic High School Ass'n of the Archdiocese of New York v. Culvert*, 753 F.2d 1161 (2d Cir.1985), the Second Circuit considered a challenge under the rule of *Catholic Bishop* to the New York State Labor Relations Board's exercise of jurisdiction over labor relations between parochial schools and their lay teachers. Recognizing the "delicate issues" presented, the Court permitted the State Labor Board to operate within a narrow range of jurisdiction over the schools, since there was "a principled basis upon which to limit state intrusion to secular aims" (*Culvert, supra*, at p. 1163).

The Court first stated that the State Labor Board's exercise of jurisdiction over teachers and their church operated school would implicate the guarantees of the Religion Clauses (*Culvert, supra*, at p. 1165). The Court held that in light of *Catholic Bishop*, given "the possibility of recurrent questioning of whether a particular church actually holds a particular belief ... the First Amendment prohibits the State Board from inquiring into an asserted religious motive [for terminating the employment of a lay teacher] to determine whether it is pretextual" (*Culvert, supra*, at p. 1168). However, in an effort to accommodate the state's interests, the Court noted that the State Board was "still free to determine, using a dual motive analysis, whether the religious motive was in fact the cause of the discharge" (*Id.*). Therefore, the Court held that:

"[t]he Board may—consistent with the First Amendment—protect teachers from unlawful discharge by limiting its finding of a violation to those cases in which the teacher would not have been discharged 'but for' the unlawful motivation. [But] [w]ere the Board allowed to apply an 'in part' test in addressing an asserted religious motive, an order based on such a finding would violate the First Amend-

ment" (*Culvert, supra,* at p. 1169) (citations omitted).

Thus the Court eliminated "mixed motive" cases from the State Board's jurisdiction, leaving to it determinations of unlawful discharge only in the case of a discharge caused in fact by an unlawful non-religious motive. The Court, therefore, determined that the State Labor Board possessed only limited jurisdiction over the interaction between the parochial schools and their teachers. Judge Pratt dissented on the constitutional issue, in part for the reasons set forth in the Seventh Circuit's opinion in *Catholic Bishop.*

While appearing to lend support for the application of ADEA to Holy Cross, the *Culvert* decision is not controlling. It pertains to a state labor agency and does not address the application of federal law. Furthermore, unlike the ADEA statute, the legislative history in *Culvert* was clear in its intent that the State Labor Board's jurisdiction include parochial schools. Moreover, the collective bargaining agreement between the plaintiff and the union expressly excluded from its grievance procedures anything that would interfere with the schools' execution of their functions and duties that were "canonical, ecclesiastical, or religious in nature" (*Culvert, supra,* at p. 1163 n. 1). Therefore, by the terms of the collective bargaining agreement itself religious issues were exempt from the State Labor Board's jurisdiction. Accordingly, the accommodationist result which obtained in *Culvert* would not be appropriate here.

In the most recent case applying the *Catholic Bishop* doctrine, *Intercommunity Center for Justice and Peace v. Immigration and Naturalization Serv.,* 910 F.2d 42 (2d Cir.1990), the Second Circuit considered a challenge to the applicability of the Immigration Reform and Control Act to a religious organization. The plaintiff sought a declaratory judgment exempting it from the Act. At the District Court its suit was dismissed for failure to state a claim. On appeal, the Second Circuit determined that compliance with the Act resulted in no infringement of the plaintiff's First Amendment rights. Therefore, there

was no constitutional violation under the Free Exercise Clause. As a result, the plaintiff failed to satisfy the first prong of the *Catholic Bishop* analysis and the Court affirmed the dismissal of the complaint.

### f. *The First Amendment and The Discrimination Cases*

While the Second Circuit has yet to pass on the issue before the Court, other federal Courts have addressed the question, reaching different results.

In *Scharon v. Saint Luke's Episcopal Presbyterian Hosp.,* 929 F.2d 360 (8th Cir. 1991), an ordained priest who had been employed as chaplain at a church affiliated hospital, brought an age and gender discrimination suit against the hospital. Leaving open the question of the general applicability of ADEA and Title VII in the religious employment context, the Eighth Circuit ruled that under *Catholic Bishop* and *Lemon,* permitting the ADEA and Title VII claims of a chaplain-employee against her religious employer would violate the First Amendment (*see Scharon, supra,* at p. 361–62, n. 2).

Although not expressly stated, the *Scharon* Court appears to have melded the analyses set forth by the Supreme Court in *Catholic Bishop* and *Lemon,* in order to arrive at its ultimate determination that ADEA as applied on the facts, violated the Free Exercise Clause of the constitution. While questioning whether ADEA was intended to apply to Church affiliated institutions (*Scharon, supra,* at p. 361, n. 2), the Eighth Circuit assumed that for purposes of adjudicating the defendant's summary judgment motion, ADEA applied to the defendant (the Court determined that it was clear Title VII was applicable). By assuming the application of ADEA, the Eighth Circuit went beyond *Catholic Bishop*'s limited analysis, which was designed not to adjudicate constitutional questions but to avoid construing laws in violation of the Constitution, where possible. To determine whether Title VII or ADEA could be constitutionally applied, the Court implicated the third prong of the *Lemon* test as a guide to

determine the type of interaction between church and state which would withstand scrutiny under the First Amendment.

The plaintiff was characterized as a "spiritual employee who also performed some secular duties" rather than a "secular employee who happened to perform some religious duties" (*Scharon, supra,* at p. 362). Due to the primarily religious nature of the plaintiff's employment relationship with the defendant, the Court concluded that to permit the case "to continue would necessarily lead to the kind of inquiry into religious matters that the First Amendment forbids" (*id.* at p. 363). Thus, the Eighth Circuit held that the First Amendment foreclosed the application of ADEA and Title VII to the defendant hospital.

In *Minker v. Baltimore Annual Conf. of United Methodist Church,* 894 F.2d 1354 (D.C.Cir.1990) the Court of Appeals for the District of Columbia determined, without reference to *Catholic Bishop,* that the maintenance of a minister's claim under ADEA would violate the free exercise clause. Minker, a 63 year old Methodist minister employed by the United Methodist Church, charged that he was denied a pastorship position in violation of ADEA. The Court stated that a determination of " 'whose voice speaks for the church' is a *per se* religious matter" and noted "[w]e cannot imagine an area of inquiry less suited to a temporal court for decision...." (*Minker, supra,* at p. 1356–57). The *Minker* Court determined that the ADEA claim would have raised questions as to the church's spiritual policies so that the contemplation of such policies by the district court would interfere with the free exercise of religion (*Minker, supra,* at p. 1361).

In a case relied upon by the defendants, the Eastern District of Missouri, in *Cochran v. Saint Louis Preparatory Seminary,* 717 F.Supp. 1413 (E.D.Mo.1989), held that under *Catholic Bishop,* ADEA did not apply to a church operated school.

In *Cochran,* a seminary employee alleged that he was terminated by his employer, the defendant Church operated school, in violation of ADEA. In adjudicating the summary judgment motion of the defendant, the Court found that the application ADEA to the seminary would give rise to "serious constitutional questions" such as a state's entanglement with the religious mission of such institutions (*see Cochran, supra,* at p. 1417).

The *Cochran* Court observed that claims made pursuant to ADEA will implicate the involvement of the Equal Employment Opportunity Commission in its investigatory, as well as in its enforcement capacity (*see Cochran, supra,* at p. 1416). Furthermore, the Court noted that ADEA claims which reach the federal court will be subject to the analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). This would call into question the employer's rationale as to whether the employment decision was pretextual or made in good faith (*see Cochran, supra,* at p. 1416). The court expressed concern that the application of ADEA could impose a chilling effect on the religious body's exercise of control over the school's religious mission. The *Cochran* Court ruled therefore, that if applied to religious institutions, ADEA would necessarily require inquiry into the religious function of the school, thereby raising serious constitutional questions.

In accordance with the *Catholic Bishop* analysis, the *Cochran* Court next examined the legislative history to ADEA to determine whether Congress intended it to apply to institutions such as the seminary. Finding the statute silent on this question, the Court concluded that Congress had not clearly expressed an intent to apply ADEA to church operated schools, and therefore, did not contemplate its application to such schools. Since no affirmative jurisdiction was conferred, the Court declined to apply ADEA to the defendant and granted the defendant's motion for summary judgment dismissing the complaint.

On the other hand, in *Lukaszewski v. Nazareth Hosp.,* 764 F.Supp. 57 (E.D.Pa. 1991), the court rejected the defendants request for an exemption from ADEA. Applying the *Catholic Bishop* test, the Court determined that the defendant was not entitled to an exemption because there

was little risk that the adjudication of the ADEA claim would result in inquiry into the hospital's religious philosophy (*see Lukaszewski, supra,* at p. 60). The Court focused on the fact that the plaintiff, Lukaszewski, the Director of Plant Operations for the defendant hospital, was discharged for allegedly using racial epithets toward other employees of the hospital. The hospital maintained he was discharged because the use of such language violated its religious tenets. The Court stated, however, that "[r]egardless of the church's religious principles, the use of racial slurs or racial harassment is a legitimate nondiscriminatory reason for firing an employee." Therefore, "the wisdom of [the hospital's] policy against racial slurs and harassment [would] not be an issue" (*Lukaszewski, supra,* at p. 60).

In addition, the Court distinguished the *Catholic Bishop* and *Cochran* cases. In *Lukaszewski,* the defendant was a hospital, as opposed to a religious teaching institution. Furthermore, Lukaszewski was an administrator charged with overseeing the operation and physical facility of the hospital. In this regard, the Court stated that "[r]eligious doctrine is a much less important factor in most hospital personnel decisions than it is in religious school decisions to hire and fire teachers" (*Lukaszewski, supra,* at p. 60). The Court also noted that the plaintiff "was a secular employee; his administrative responsibilities did not include church administration or religious matters."

The *Lukaszewski* Court found such facts less likely to produce a conflict between the First Amendment rights of the defendant and the protections afforded the plaintiff under ADEA. Therefore, the Court held that ADEA, as applied, did not violate the Religion Clauses (*Lukaszewski, supra,* at p. 61) (*see also Soriano v. Xavier Univ. Corp.,* 687 F.Supp. 1188, 1189 [S.D.Ohio 1988] [plaintiff "employee" of religious university moved to strike jurisdictional defenses based on *Catholic Bishop;* Court granted plaintiff's motion and held that "enforcement of the age discrimination law does not entangle nor endanger the religion clauses of the first amendment, especially in light of the relatively narrow focus of ADEA"]).

## DISCUSSION

■ The foregoing cases demonstrate that there is no consensus in the law as to the applicability of ADEA to religious institutions. However, in this Court's view there are certain factors which are relevant, and provide dispositive guidance to the Court in this case.

The Court notes that while the *Catholic Bishop* case pertained to the NLRA, this doctrine provides the appropriate analytical framework for determining this ADEA case. Therefore, the Court must first determine whether the application of ADEA to the defendant Holy Cross, a church-affiliated school, would give rise to "serious constitutional questions." In this regard, the Court finds guidance in the Supreme Court's decision in *Lemon* and its progeny.

As noted, several courts have recognized that the application of ADEA to religiously affiliated educational employers would trigger certain church-state interaction and serious constitutional questions would be inevitable (*see Cochran, supra; Scharon, supra*). For example, in the context of the familiar *McDonnell Douglas* shifting burden that a religious school would be compelled to undergo during the course of an ADEA action, requiring a parochial school to come forward with a nondiscriminatory reason for a denial of tenure or a discharge, may subject its religious philosophy to governmental scrutiny. A contention that an instructor had failed to adequately discharge his non-secular duties could subject the religious tenets of the parochial institution to the value judgments of the Court, a temporal body normally not in a position to make such determinations.

Bearing in mind that religious institutions are not free from all state regulation (*see Smith, supra,* at p. 1600) and that absolute separation between church and state is not possible (*see Lemon, supra,* 403 U.S. at p. 614, 91 S.Ct. at p. 2112), nevertheless, the prospect of recurrent inquiry as to the value or truthfulness of

church doctrine, as expressed by one of its teaching institutions, could impermissibly impinge on the church's ability to effectuate its religious mission. The mere specter of such entanglement could have a chilling effect, placing the institution in a conflict between complying with federal law or following the mandate of its religious teaching. This is "the sort of entanglement that the Constitution forbids" (*Lemon, supra*, at p. 620, 91 S.Ct. at p. 2115).

Deep seated religious beliefs which are an integral part of the defendant's employment decisions, should not be subjected to such governmental review. In effect, to apply ADEA to Holy Cross could result in "federal court oversight" into the mission of a religious employer (*see e.g., Little v. Wuerl*, 929 F.2d 944, 949 [3d Cir.1991] [following *Catholic Bishop* in denying Title VII claim against a Catholic school]).

Furthermore, the likelihood of impermissible state intrusion is enhanced by the nature of the plaintiff's employment. The *Catholic Bishop* Court noted the "unique role" the teacher plays in a religious educational system (*Catholic Bishop, supra*, 440 U.S. at p. 501, 99 S.Ct. at p. 1319). As compared to the purely secular employee in a religious institution, such as a custodian, the lay instructor responsible for demonstrating spiritual leadership is closely identified with the religious mission of the institution. Consequently, employment roles which include religious duties, such as the plaintiff's position, may heighten the probability of prohibited church and state entanglement (*see e.g.*, David L. Gregory, *Government Deregulation of Religious Institutional Employers Through Labor and Employment Discrimination Laws*, 22 Stetson L.Rev. 1 [1992] [suggesting job activity of employee bears on entanglement issue in Title VII cases]).

Therefore, in this Court's view, serious constitutional questions would be raised if the defendant Holy Cross was compelled to defend ADEA law suits brought by lay instructors charged with nonsecular duties.

Having determined that such questions involving potential religious entanglements are present in this case, the Court must next resolve whether the ADEA legislative history clearly indicates an intent that it should apply to parochial institutions such as Holy Cross.

As noted, the statute itself is silent as to whether religious institutions are subject to ADEA. In fact, as stated by the *Scharon* Court, "there is no language in the ADEA nor any legislature history that indicates an intent by Congress to apply the ADEA to church affiliated institutions" (*see Scharon, supra*, at p. 361 n. 2; *see also Cochran, supra*, at p. 1416).

Only the *Lukaszewski* Court has stated that the ADEA legislative history suggests that it was the intent of Congress to extend its coverage to religious institutions (*see Lukaszewski, supra*, at p. 61). That Court assumed that since certain portions of ADEA were derived from Title VII of the Civil Rights Act of 1964, which statute expressly excludes religious institutions from its prohibition of discrimination on the basis of religion, Congress must have intended ADEA to apply to such institutions because it failed to contain a similar exclusion. However, this analysis fails to meet the standard set forth in *Catholic Bishop*, which, in this case, calls upon the Court to refrain from applying ADEA unless the affirmative intention of Congress that ADEA should apply, is clearly expressed.

After reviewing the ADEA legislative history and in light of the Sixth Circuit's holding in *Scharon* and the holding in *Cochran*, it is clear that there is an "absence of an 'affirmative intention of the Congress clearly expressed'" (*Catholic Bishop, supra*, 440 U.S. at p. 506, 99 S.Ct. at p. 1322) that ADEA should apply to a parochial school such as Holy Cross. As a result, the second prong of the *Catholic Bishop* test has been met.

The application of ADEA to the defendant Holy Cross would give rise to serious constitutional questions and excessive church-state entanglements. Further, there is no affirmative Congressional intention that ADEA should apply to religious institutions such as Holy Cross. Accordingly, this Court declines to construe the statute in such a way as to put ADEA in jeopardy of violating the Religion Clauses of the First Amendment. Therefore, the

Court finds that ADEA does not apply with regard to the claim by the plaintiff-lay instructor DeMarco against Holy Cross.

Accordingly, the defendant's motion for summary judgment dismissing the complaint is granted. The Court need not address the direct constitutional attack under the Free Exercise and Establishment Clauses as raised by the defendant, nor does it need to address whether the plaintiff exhausted remedies pursuant to 29 U.S.C. § 633(b). The Clerk of the Court is directed to enter judgment on behalf of the defendant Holy Cross High School, dismissing the complaint.

SO ORDERED.