### Michael HARTWIG, Plaintiff,

v.

### ALBERTUS MAGNUS COLLEGE and Julia McNamara, Defendants.

### No. 3:98CV51 (CFD).

United States District Court, D. Connecticut.

March 13, 2000.

Maureen M. Murphy, New Haven, CT, for plaintiff.

Bernard E. Jacques, Updike, Kelly & Spellacy, P.C., Hartford, CT, Christopher Brigham, Updike, Kelly & Spellacy, P.C., New Haven, CT, for defendant.

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

DRONEY, District Judge.

The plaintiff in this action seeks damages and employment reinstatement under various Connecticut common law causes of action in a seven count complaint originally filed in the Connecticut Superior Court. The defendants removed this action based on diversity of citizenship. Following removal the defendants answered the complaint and asserted affirmative defenses. Pending is the defendants' motion for summary judgment.

### Facts [1]

In 1979 the plaintiff, Michael Hartwig ("Hartwig"), was ordained a Roman Catholic priest and assigned to the diocese of Dallas, Texas. In 1987, Hartwig informed his superiors that he is homosexual. As a result, the bishop placed Hartwig on a six month leave of absence and advised him to seek counseling. Following this leave of absence, Hartwig met with the bishop to discuss the matter further. Hartwig maintains that, at that meeting, the bishop placed him on a "permanent leave of absence from the active ministry." Hartwig subsequently relocated to Connecticut.

Defendant Albertus Magnus College ("the College") is a liberal arts college in New Haven, Connecticut, sponsored by the Dominican Sisters of St. Mary of the Springs in Columbus, Ohio The College is named after St. Albert the Great, who was born in the thirteenth century and was a member of the Dominican Order of priests. He was later named a saint in the Roman Catholic Church. The College is listed as a Catholic college in the Official Catholic Directory, which is the definitive compila-

---

1. The recited facts are taken from the parties' Local Rule 9 statements and the materials appended thereto, and are undisputed unless otherwise noted.

tion of Roman Catholic institutions in the United States. The Statement of Mission in the College's Faculty Handbook provides, in relevant part:

> From its founding in 1925 by the Dominican Sisters of Saint Mary of the Springs, Albertus Magnus College has placed strong emphasis on the liberal arts, preserving the long tradition of scholarly inquiry and of the search for truth that has characterized the Dominican Order for 700 years.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> Thus, the mission of Albertus Magnus College is to produce well prepared, capable, forward-looking, and liberally-educated men and women, fully able to work productively in a career and live enriched and enriching lives. Albertus Magnus remains faithful to the Judeo–Christian tradition and to its Catholic heritage, aware of and ready to respond to the evolving needs of its own students and of society at large.

In addition, the by-laws of the College's board of trustees state, in part: "It is the responsibility of the Board of Trustees to maintain, in perpetuity, the essential character of the institution as a Catholic liberal arts college with a Dominican tradition and to insure that its educational program, and the service it renders, are in harmony with this commitment and tradition." The by-laws also provide that one-fifth of the board of trustees shall be from the Dominican Congregation of St. Mary of the Springs and that certain officials of that congregation shall be members of the board.[2]

In 1991, Hartwig applied for a position as an associate professor in the College's Department of Religious Studies and Philosophy. He represented in his resumé that he "[t]ook permanent leave of absence from active ministry in Roman Catholic Priesthood at the end of 1987 for personal reasons" and was interviewed by members of the College faculty and administration, including the defendant Dr. Julia McNamara ("Dr.McNamara"), the president of the College.

Hartwig accepted a one year appointment as an associate professor in the Department of Religious Studies and Philosophy and was provided with a copy of the College Faculty Handbook ("the Handbook"). The Handbook provided that the College would not discriminate against employees on the basis of sexual orientation, contained language concerning the academic freedom for teachers, and set forth procedures for reappointment of non-tenured faculty members. According to the Handbook, tenure could be conferred upon an associate professor by the Board of Trustees after the tenth year of an associate professor's employment at the College.

From 1991 through 1998 Hartwig was reappointed to one year terms. During his employment at the College, Hartwig taught a variety of courses in the traditional day, continuing education, and Master of Arts in Liberal Studies programs.[3] He served as the coordinator of Peace, Justice, and Global Studies and was the Associate Dean for Continuing Education.

During the academic year 1991–1992, Hartwig introduced Donald Baker ("Baker"), whom he described as his "life partner," to faculty and members of the College administration. The parties agree that no negative comments were made, no criticism of Hartwig's sexual preference was voiced and he experienced a general acceptance by the faculty and staff of his relationship with Baker.

In June, 1997, Dr. McNamara received a copy of an article from a publication

---

2. The College's constitution also provides that it may place religious limitations on the academic freedom of its teachers.

3. The materials submitted by the parties do not reveal the names of these courses or the subjects that were taught by Hartwig, other than "Sexual Ethics," the course he taught as an adjunct professor. *See* Answer and Affirmative Defenses at ¶ 5.

called *The Wanderer*.[4] The article was entitled "Diocese Rotten Underbelly Exposed in Pedophile's Trial" and reported that the Diocese of Dallas had been found liable in an action involving a priest (not Hartwig) who had sexually abused a number of boys. According to the article, the priest had abused the boys because the Diocesan officials were "too liberal." Although not implicating him in the incident, the article associated Hartwig with the founder of the Dallas area gay and lesbian alliance, Donald Baker. The article stated that Hartwig and Baker now lived together in Boston and that Hartwig was "a Roman Catholic priest and former academic dean at Holy Trinity Seminary in Irving [Texas]."[5] The article further discussed how Hartwig had been "on the fast track" in the Roman Catholic Church and "probably would have been named a bishop had he not 'married' Don Baker." The article also included the following description of Hartwig's status:

Hartwig is now a professor in the religion and philosophy department at Albertus Magnus College run by the Dominican Sisters in New Haven, Conn., where he also serves as the associate dean of continuing education and director of the masters of arts and liberal studies department.

Following her receipt of the article, Dr. McNamara met with Hartwig to discuss it. At the meeting, Hartwig read the article and protested that much of it was untrue. Dr. McNamara assured Hartwig of her support.

In August, 1997, Dr. McNamara received a copy of a second article from *The Wanderer* concerning the Dallas court case. In the article the anonymous author claimed to have been a seminarian at Holy Trinity Seminary while Hartwig worked there. He wrote that Hartwig had been "angered and emotionally upset" with the Roman Catholic Church's teaching on homosexuality. The article identified Hartwig as an "ex-priest" who taught at Albertus Magnus and who was "'married' to another man."

Dr. McNamara met with Hartwig again to discuss the second article. She assured him that she placed little faith in the article and continued to support him. She indicated, however, that pressure could be placed on the College because of Hartwig's teaching role and asked if he would be interested in teaching in a department other than Religious Studies. Hartwig indicated that he was not.

After both of the meetings, Hartwig sent memoranda to Dr. McNamara summarizing their meetings and further discussing *The Wanderer* articles. In addition, he sent her a third memorandum to which he attached an opinion-editorial piece ("the op-ed") he had written which had been recently published in *The Dallas Morning News*. In the op-ed, the plaintiff described himself as "a priest of the Dallas Diocese (now on leave)". At the conclusion of the article, a note read "Michael J. Hartwig is a former vice rector of Holy Trinity Seminary in Dallas and is now an associate professor of religion at Albertus Magnus College in New Haven, Conn." In the op-ed piece Hartwig discussed the Dallas case and expressed his "mixed feelings" about the verdict and substantial judgment that had been returned against the church.

On October 20, 1997, Dr. McNamara requested that Hartwig report to her office the following day. The meeting did not occur. However, the next day Dr. McNamara had a letter delivered to Hartwig which informed Hartwig that he was relieved of all his administrative and teaching duties because of his "publicly representing [himself] as a priest of the Roman Catholic Church." Upon receipt of the

---

4. *The Wanderer* appears to be a national newspaper which focuses on issues involving the Roman Catholic Church in the United States.

5. This is the seminary where Hartwig and the priest accused of sexual misconduct had been assigned.

letter, Hartwig called Baker, who then called the *New Haven Register* newspaper and spoke with a reporter about the termination of Hartwig's employment. The reporter conducted an investigation and wrote an article for the newspaper discussing Hartwig's situation at the College.

Hartwig filed a grievance with the College protesting his termination.[6] Following the faculty committee's decision rejecting the grievance, Hartwig brought this action. The complaint asserts the following causes of action: breach of contract based on the anti-discrimination, academic freedom, and reappointment provisions of the Handbook (Counts 1, 2, and 3); defamation (Count 4); libel (Count 5); tortious interference with contract (Count 6); and intentional infliction of emotional distress (Count 7).[7]

The defendants have moved for summary judgment on all seven counts of the complaint. The defendants argue, *inter alia*, the Free Exercise and Establishment Clauses of the First Amendment preclude the Court from hearing this case.

## Discussion

### A. Standard for Summary Judgment

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *See* Rule 56(c), Fed.R.Civ.P.; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court must grant summary judgment " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact....' " *Miner v. City of Glens Falls*, 999 F.2d 655, 661 (2d Cir.1993) (citation omitted). A dispute regarding a material fact is genu-

ine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505), *cert. denied*, 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Rule 56 provides that an affidavit submitted in opposition to summary judgment 'shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.' " *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir.1999) (quoting Fed. R.Civ.P. 56(e)). *See also H. Sand & Co. v. Airtemp Corp.*, 934 F.2d 450, 454–55 (2d Cir.1991). "Summary judgment is thus warranted when the nonmoving party has no evidentiary support for an essential element on which it bears the burden of proof." *Silver v. City University of New York*, 947 F.2d 1021, 1022 (2d Cir.1991) (citing *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548).

The Court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich*, 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). *See also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d

---

6. The Defendants appear to maintain that Hartwig was not reappointed; plaintiff appears to maintain he was terminated. Both terms will be utilized in this opinion without expressing a view as to which may be correct.

7. Counts one through four and seven appear to name the College and Dr. McNamara as defendants. Dr. McNamara appears to be the only defendant in counts five and six.

Cir.1992). Additionally "[w]here, as here, the non-movant bears the burden of proof at trial, the movant can satisfy its burden of production by pointing out an absence of evidence to support an essential element of the non-movant's case." *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 270 (2d Cir.1999) (citing *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548 and *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 95 (2d Cir.1998)).

## B. The Free Exercise Clause

### 1. In General

■ Under the First Amendment to the U.S. Constitution, Congress is barred from making any law "prohibiting the free exercise" of religion. U.S. Const.Amend. 1. Also, in addition to protecting against intrusive legislation, "the Free Exercise Clause restricts the government's ability to intrude into ecclesiastical matters or to interfere with a church's governance of its own affairs." *Bollard v. California Province of the Society of Jesus*, 196 F.3d 940, 944 (9th Cir.1999) (citing *Kedroff v. St Nicholas Cathedral of the Russian Orthodox Church in North America*, 344 U.S. 94, 116, 73 S.Ct. 143, 97 L.Ed. 120 (1952)).[8] As the U.S. Supreme Court has stated, it is well settled that "[o]n matters of church discipline, faith, practice, and religious law, the Free Exercise Clause requires civil courts to refrain from interfering with the determinations of the 'highest of these church judicatories to which the matter has been carried.'" *Lewis v. Seventh Day Adventists Lake Region Conference*, 978 F.2d 940, 941–942 (6th Cir.1992) (quoting *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 727, 20 L.Ed. 666 (1871)). This protection of the Free Exercise Clause is not limited to churches; it has been extended to various religiously-affiliated institutions, including schools. *See e.g., EEOC v. Catholic University of America*, 83 F.3d 455, 465 (D.C.Cir.1996) (university); *Little v. Wuerl*, 929 F.2d 944, 947–948 (3d Cir.1991) (elementary school); *see also Natal v. Christian and Missionary Alliance*, 878 F.2d 1575, 1578 (1st Cir.1989) (not-for-profit religious organization). In the employment context, this principle has most frequently been applied when the dispute relates to the hiring or firing of clergy. *See, e.g., Lewis*, 978 F.2d at 942 (common law causes of action brought by discharged minister barred by First Amendment); *Drevlow v. Lutheran Church, Missouri Synod*, 991 F.2d 468, 471 (8th Cir.1993) (same); *see also Catholic University*, 83 F.3d at 461 (collecting cases holding that Free Exercise Clause exempts the selection of clergy from Title VII and similar statutes).[9]

---

**8.** Free Exercise Clause arguments are typically made by churches and religiously-affiliated institutions seeking to avoid the application of a federal or state statute. Determining whether a statute violates the free exercise clause depends upon an examination of the following three factors: (1) the magnitude of the statute's impact upon the exercise of the religious belief; (2) the existence of a compelling state interest justifying the burden imposed upon the exercise of the religious belief; and (3) the extent to which recognition of an exemption from the statute would impede the objectives sought to be advanced by the state. *See EEOC v. Mississippi College*, 626 F.2d 477, 488 (5th Cir.1980), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981) (citing *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) and *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)). Free Exercise Clause arguments, however, are also applicable to common law causes of action involving religious institutions. *See e.g. Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 717–720, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976) (civil court precluded from adjudicating case concerning defrockment of clergyman); *see also Bollard*, 196 F.3d at 950 (common law claims of failure to investigate, constructive discharge and breach of contract also subject to restrictions of the Free Exercise Clause).

**9.** This is because a church's relationship with members of its clergy is its "lifeblood". *See EEOC v. Pacific Press Publishing Assoc.*, 676 F.2d 1272, 1278 (9th Cir.1982); *see also Lewis*, 978 F.2d at 942.

In the instant case, the College argues that its selection, retention, and dismissal of faculty members, such as Hartwig, are ecclesiastical matters that are shielded from Court inquiry by the Free Exercise Clause.

### 2. The Selection and Termination of Clergy

As mentioned above, courts have recognized that employment of clergy members may be an "essentially ecclesiastical" matter shielded from court inquiry by the Free Exercise Clause. *See Bollard,* 196 F.3d at 945; *see also Rayburn v. General Conference of Seventh-Day Adventists,* 772 F.2d 1164, 1168 (4th Cir.1985) (Free Exercise Clause barred court from hearing employment dispute between clergy member and Seventh-day Adventist Church), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986). For example, courts may be precluded from adjudicating employment discrimination suits by members of the clergy against the church or religious institution employing them. *Bollard,* 196 F.3d at 945. This prohibition, however, is not limited to cases involving members of the clergy, but appears to be based on the actual duties and responsibilities of the individual *See Catholic University,* 83 F.3d at 461; *see also Bollard,* 196 F.3d at 947 (citations omitted). "As a general rule, if the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual or worship, he or she should be considered 'clergy' ". *Rayburn,* 772 F.2d at 1168 (citation omitted); *see also Catholic University,* 83 F.3d at 461. Put differently, "[i]f their positions are 'important to the spiritual and pastoral mission of the church,' employees 'should be considered clergy.' " *Id.* This Free Ex-

ercise Clause bar to litigation has been often referred to as the "ministerial exception," although it also has been applied to lay persons performing religious duties and functions.[10] *See e.g., Catholic University,* 83 F.3d at 461 (collecting cases).

Courts have often been called upon to examine the question of whether the maintenance of an employment discrimination action by an employee against a religiously-affiliated institution or business violates the Free Exercise Clause. The decisions teach that the resolution of this question depends upon an examination of (1) the nature and extent of the religious affiliation of the institution or business, and (2) the job duties and responsibilities of the employee. The following decisions held that the Free Exercise Clause prohibited the adjudication of employment disputes between religiously-affiliated institutions and their employees.

In *E.E.O.C. v. Catholic University of America, supra,* the co-plaintiff was a Dominican nun who, after earning a doctorate of canon law at Catholic University, obtained a teaching position in that university's Department of Canon Law. In addition to teaching classes, she assisted students, published articles, and performed various consulting services. Eventually she was promoted to associate professor and, shortly thereafter, she submitted a tenure application, which was denied. That decision was claimed by the university to be based on her lack of scholarly achievement, teaching performance, and qualifications for the position. *See Catholic University,* 83 F.3d at 457–459. She and the EEOC then brought a Title VII action alleging sex discrimination. The district court dismissed the case, concluding that application of Title VII in the case would

---

**10.** The "ministerial exception" has been applied by courts to various federal anti-discrimination statutes, such as Title VII. *See Bollard,* 196 F.3d at 945; *Rayburn v. General Conference of Seventh-Day Adventists,* 772 F.2d 1164, 1168 (4th Cir.1985)(collecting cases). However, because the source of the exception is the constitution, *Bollard,* 196 F.3d at 945, it has been applied to bar common law causes of action as well. *Bollard,* 196 F.3d at 950.

violate the Free Exercise and Establishment Clauses. *Id.* at 460.

On appeal, the D.C. Circuit Court of Appeals considered the parameters of the Free Exercise Clause and the "ministerial exception." The court concluded that the "ministerial exception encompasses all employees of a religious institution, whether ordained or not, whose primary functions serve the spiritual and pastoral mission [of the church]." *Catholic University*, 83 F.3d at 463 (citing *Rayburn*, 772 F.2d at 1169). With respect to the co-plaintiff, the court stated that "as a member of [the Department of Canon Law] faculty, she would be entrusted with instructing students in the 'fundamental body of ecclesiastical laws' that governs the Church's sacramental life, defines the rights and duties of its faithful and the responsibilities of their pastors, and guides its administration." *Catholic University*, 83 F.3d at 464. The court also recognized that this faculty performed a special role in the spiritual and pastoral mission of the Catholic Church; for example, the Department of Canon Law is the sole entity in the United States empowered by the Vatican to confer ecclesiastical degrees in canon law. *Id.* The court found that although the co-plaintiff was not a priest, "she is a member of a religious order who sought a tenured professorship in a field that is of fundamental importance to the spiritual mission of her Church." *Id.* Accordingly, the court concluded that decision not to award her tenure fit within the ministerial exception to Title VII and her claims arising out of that decision were appropriately dismissed under the Free Exercise Clause. *Id.*

Similarly, in *Powell v. Stafford*, 859 F.Supp. 1343 (D.Colo.1994), the plaintiff teacher was employed by a Roman Catholic high school operated by the Archdiocese of Denver and taught students Roman Catholic doctrine. He taught no other courses and held some classes in the school's chapel Before being hired by the school, the plaintiff had been an ordained Catholic Priest. In 1973, however,

the plaintiff regained his lay status. He then taught Roman Catholic theology for thirteen years at the high school under a series of one year renewable teaching contracts. As the start of his fourteenth year approached, however, he was told that he would not be offered a new contract.

The plaintiff brought an action under the Age Discrimination in Employment Act ("ADEA"). The Archdiocese moved to dismiss arguing, *inter alia*, that subjecting it to the requirements of the ADEA and granting the relief sought by the plaintiff would violate the Free Exercise Clause. *See Powell*, 859 F.Supp. at 1346.

In addressing the motion, the district court focused on the school's religious affiliation and the plaintiff's role at the school. *Id.* As an initial matter, the court noted that there was no dispute as to the school's religious affiliation. *Id.* With respect to the plaintiff's role at the school, the *Powell* court concluded that his duties were "pervasively religious in nature" because he taught Roman Catholic theology and held some of his classes in the school chapel, so that his students could pray during class. *Id.* Relying on the Fourth Circuit's decision in *Rayburn, supra*, the *Powell* court concluded that the plaintiff was a ministerial or spiritual employee, and, therefore, the dispute concerning the non-renewal of his teaching contract was not a matter it could adjudicate. *Id.* at 1347. The court also stated: "Powell was not denied employment teaching a secular subject. Simply put, there is no teaching position more closely tied to a Roman Catholic school's religious character than the teaching of Roman Catholic doctrine." *Id.* (citing *Maguire v. Marquette University*, 627 F.Supp. 1499, 1505 (E.D.Wis.1986), *aff'd in part and vacated in part on other grounds*, 814 F.2d 1213 (7th Cir.1987))

Finally, in *Maguire v. Marquette University*, 627 F.Supp. 1499 (E.D.Wis.1986), the plaintiff was a woman who unsuccessfully applied for a position as an associate professor of theology at the defendant Ro-

man Catholic university.[11] The plaintiff claimed that the university refused to hire her because of her gender and because of her views on abortion, in violation of Title VII.

The *Maguire* court held that the plaintiff's sex discrimination claim was barred by the Free Exercise Clause. *Id.* at 1505. In reaching this conclusion, the district court focused on whether the position sought by the plaintiff was religious in nature. *Id.* at 1504. The court stated: "There is probably no teaching position at Marquette University which is more closely related to the University's religious character than that of theology professor." *Id.* The *Maguire* court intimated that it may have reached a different conclusion if the plaintiff had sought a position in one of the University's secular departments; however, given the inherently religious nature of the position she sought, further court inquiry into the basis for the University's refusal to hire her was barred by the Free Exercise Clause *See id.*

In contrast, several courts have held that the Free Exercise Clause did not bar civil actions by former employees against religiously-affiliated institutions or businesses. These decisions teach that the Free Exercise Clause does not bar court adjudication of such disputes where the religious affiliation of the institution or business is not pervasive or the duties of the aggrieved employee are more fairly characterized as secular, rather than ministerial or pastoral.

For example, in *EEOC v. Mississippi College*, 626 F.2d 477 (5th Cir.1980), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981), Dr. Patricia Summers ("Dr.Summers") obtained part-time employment with the defendant college as an assistant professor in the psychology department. The college was owned and operated by the Mississippi Baptist Convention, an organization comprised of Southern Baptist churches in Mississippi. The college had a stated preference for hiring Baptists and the faculty and student body were overwhelmingly comprised of members of the Baptist faith. While employed part-time, Summers applied for a full-time opening in the same department. However, instead of hiring Dr. Summers the college hired a male, citing its preference to hire someone with a background in experimental psychology. Dr. Summers filed a charge of gender discrimination with the EEOC. During the course of its investigation, the EEOC issued an administrative subpoena to the college, but the college refused to comply. Thereafter, the EEOC brought the action seeking enforcement of the subpoena. The district court dismissed, relying on *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir.), *cert. denied*, 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972), which held that the Free Exercise Clause shielded church-minister employment issues from the application of Title VII. *See Mississippi College*, 626 F.2d at 485. The district court found that the college had an express preference for hiring Baptists and noted that, while Dr. Summers was a Presbyterian, the male whom the college hired was a Baptist. The court concluded that because Section 702 of Title VII expressly provided that religiously-affiliated entities could choose to hire individuals on the basis of religious beliefs, further inquiry by the EEOC into the college's decision not to hire Dr. Summers was prohibited.[12] The court also

---

**11.** Marquette University is operated by the Jesuit Order and consists of thirteen colleges offering graduate and undergraduate degrees to approximately ten thousand students. Undergraduate students in business administration, liberal arts, medical technology, nursing, physical therapy, and speech therapy, complete courses for credit in theology. *Maguire*, 627 F.Supp. at 1501.

**12.** Title VII prohibits discrimination against an employee on the basis of religion. *See* 42 U.S.C. § 2000e–2. However, Title VII specifically exempts religious institutions from this prohibition. *See* 42 U.S.C. § 2000e–1. This exception does not exempt religiously-affiliated employers from liability for discrimination on the basis of other prohibited factors, such as race. *See DeMarco v. Holy Cross High*

concluded that further investigation by the EEOC would violate the college's Free Exercise Clause and Establishment Clause rights. *See Mississippi College*, 626 F.2d at 478–481. The EEOC appealed, raising several arguments, including the claim that the Free Exercise Clause did not bar its investigation of the college's hiring practices.

The Fifth Circuit Court of Appeals agreed with this argument, reversed the district court, and distinguished *McClure*, stating:

> The facts distinguish this case from *McClure*. The College is not a church. The College's faculty and staff do not function as ministers. The faculty members are not intermediaries between a church and its congregation. They neither attend to the religious needs of the faithful nor instruct students in the whole of religious doctrine. That faculty members are expected to serve as exemplars of practicing Christians does not serve to make the terms and conditions of their employment matters of church administration and thus purely of ecclesiastical concern.

*Mississippi College*, 626 F.2d at 485.

Similarly, in *Shirkey v. Eastwind Community Dev. Corp.*, 941 F.Supp. 567 (D.Md.1996), the plaintiff, a white minister in the United Methodist Church, applied for a position as a "community developer" with a Methodist Church-funded non-profit community development organization. The organization had been set up to promote economic development, reduce unemployment, and improve the quality of life in a predominantly black East Baltimore community. The plaintiff was denied the position because the church required that it be filled by an African–American. The plaintiff brought an action under 42 U.S.C.

§ 1981, alleging employment discrimination on the basis of race.

In ruling on the defendant's motion for summary judgment, the *Shirkey* court rejected the defendant's argument that the action was barred by the Free Exercise Clause because resolution of the case would require the court to adjudicate a dispute between the church and one of its ministers. In reaching this decision the court found that the job description which the church approved for the position did not require the "community developer" to lead religious services, act as a pastoral counselor, and did not require specific religious training. Therefore, the position was not the ministerial type which the Free Exercise Clause sought to shield from court inquiry. *See Shirkey*, 941 F.Supp. at 577.

Finally, the district court in *EEOC v. Pacific Press Publishing Assoc.*, 482 F.Supp. 1291 (N.D.Cal.1979), *aff'd*, 676 F.2d 1272 (9th Cir.1982), was presented with a case involving an investigation by the EEOC of a non-profit publishing company owned and operated by the Seventh Day Adventist Church. The company was in the business of publishing, printing, advertising, and selling religiously-oriented materials for the purpose of carrying out the church's work. The company required all its employees to be members of the Seventh Day Adventist Church. Lorna Tobler ("Tobler"), who was employed as a secretary by the company, complained to the EEOC of the practice of the company to pay female employees considerably less than male employees According to the company, this was done at the direction of a church governing body known as the General Conference. The EEOC brought Title VII actions on behalf of Tobler and another aggrieved employee against the company and the church alleging gender

---

*School*, 4 F.3d 166, 173 (2d Cir.1993). Title VII, however, is not applicable here because Hartwig claims that he was discriminated against on the basis of his sexual orientation, conduct not prohibited by Title VII, *see* 42 U.S.C. § 2000e–2, and because Hartwig has

brought this action under various common law causes of action, not Title VII. As previously indicated, however, the Free Exercise Clause analysis discussed herein is applicable to common law causes of action as well as Title VII. *See Bollard*, 196 F.3d at 950.

discrimination. Then, pursuant to a resolution passed by the General Conference, the company terminated Tobler's employment. The company based its decision on the conclusion that by suing the church, Tobler failed to exhibit fidelity to church authority, as required by Seventh Day Adventist teachings.

The defendants argued that because of the Free Exercise Clause the district court did not have jurisdiction to adjudicate cases involving an employment dispute between a church and a church employee. *Id.* at 1313. The court concluded, however, that while the church and the company were religious entities, Tobler—a secretary—performed secular functions. *See id.* at 1313. The court distinguished Tobler's relationship with the company and the church from that of a church an its ministers, and held that Tobler's relationship to her religious employer did not involve ecclesiastical concerns which the court was barred from considering. *See id.* at 1313.

In sum, the cases teach that the Free Exercise Clause does not shield all employment decisions by religiously-affiliated institutions. Courts are required to examine the duties and responsibilities of the particular employee and examine whether they are ministerial or secular in nature. It is only when the Court concludes that the employee had primarily religious duties and responsibilities that the employment decision made by the religiously-affiliated institution is barred from review by the Free Exercise Clause.

### 3. The Instant Case [13]

■ The evidence submitted by the parties establishes that Albertus Magnus College is closely affiliated with the Roman Catholic Church. Although Hartwig denies the College's claim that it is a "Catho-lic liberal arts college," the College is sponsored by a Dominican Order of nuns, it is named after a Roman Catholic Saint; it is listed as a Catholic College in a definitive compilation of Roman Catholic institutions in the United States; and, the by-laws for its board of directors requires that the board consist, in large part, of members and officials of the Dominican Order. Hartwig has submitted no evidence to the contrary. Accordingly, there is no question of material fact on this issue. The College is sufficiently affiliated with the Roman Catholic Church to invoke the protections of the Free Exercise Clause. .

■ On the present record, however, the Court concludes that a genuine issue of material fact exists as to whether Hartwig's duties and responsibilities were primarily religious for the purposes of Free Exercise Clause analysis. Therefore, the Court cannot conclude at this time that, as a matter of law, review of the College's decision to terminate his employment is barred by the Free Exercise Clause. Although the plaintiff was an associate professor in the Department of Religious Studies and Philosophy, questions remain as to his actual teaching and non-teaching functions. The evidence submitted does not establish that he taught Roman Catholic theology, canon law, or similar courses. It is also unclear whether the students at the College were required to take particular religion courses involving Catholic teachings and whether Hartwig taught those courses. Further, at this time the evidence does not establish that Hartwig led students in prayer or provided them with spiritual counseling.

■ The Free Exercise Clause only shields from Court inquiry employment decisions made by churches and religious-

---

**13.** As indicated, the Court's Free Exercise Clause analysis is focused on the religiously-affiliated nature of the College and the nature of Hartwig's role there, not the particular issues which spring from the termination of his employment relationship and the resulting claims. Accordingly, the following analysis focuses on whether this Court is barred from exercising jurisdiction over all the claims in this dispute by virtue of the nature of the parties involved, not the nature of the claims against the defendants.

ly-affiliated entities with respect to employees who perform ministerial functions such as teaching church doctrine and canon law, spreading the faith, governing the church, supervising a religious order, or supervising or participating in religious ritual or worship. *See Rayburn,* 772 F.2d at 1168 (citation omitted); *see also Catholic University,* 83 F.3d at 461. Although the College is a religiously-affiliated entity, the record before the Court does not establish as a matter of law that Hartwig performed such functions, notwithstanding his prior role at the Holy Trinity Seminary or his membership in the Religious Studies and Philosophy Department. Therefore, the Free Exercise Clause does not bar the Court from continuing to exercise jurisdiction over this action.[14]

## C. The Establishment Clause

The conclusion that, based on the current record, the Free Exercise Clause is not a bar to this action does not end the Court's First Amendment analysis. The Court must also consider whether the issues which the Court will have to resolve will necessarily turn upon competing interpretations of canon law, thus resulting in the Court becoming "entangled" in an ecclesiastical dispute.[15]

### 1. In General

Under the First Amendment to the U.S. Constitution, Congress is also prohibited from making any law "respecting an establishment of religion." U.S Const.Amend. 1. As the Second Circuit has pointed out, under the Establishment Clause, "religious groups, however, are generally not immune from all government regulation of their employment relationships, or from court enforcement of those laws." *Gargano v. Diocese of Rockville Centre,* 80 F.3d 87, 90 (2d Cir.1996).[16] The Establishment Clause only guards against " 'extensive or continuous administrative or judicial intrusion into the functions of religious institutions' " *Gargano,* 80 F.3d at 90 (quoting *DeMarco v. Holy Cross High School,* 4 F.3d 166, 170 (2d Cir.1993)).

### 2. Government Entanglement

■ The Establishment Clause has been interpreted to prohibit government "entanglement" with religion. For example, if the employment dispute between a church or religious entity and one of its employees would require resolution of issues of religious dogma, the Court cannot hear the case. *See Gargano,* 80 F.3d at 90, *see also Geary v. Visitation of the Blessed Virgin Mary Parish School,* 7 F.3d 324, 327 (3d. Cir.1993) (prohibited government entanglement occurs if the court is required to choose between competing interpretations of Roman Catholic law). If, however, resolution of the em-

---

**14.** This decision is based on the record before the Court at this time and is without prejudice to the defendant raising this argument at trial after presenting additional evidence concerning the nature of Hartwig's duties and responsibilities.

**15.** As discussed below, the Establishment Clause analysis which the Court is required to undertake is similar to the Free Exercise Clause analysis set forth above, but requires the Court to focus on different aspects of an employment dispute involving a religiously-affiliated institution. Some decisions blur this important distinction between the two analyses.

**16.** Traditional Establishment Clause analysis involves an examination of the applicability of a federal statute to a religiously-affiliated in-

stitution and involves the following three-part test: (1) the statute must have a secular purpose; (2) its principal or primary effect must be one that neither advances nor inhibits religion; and (3) the statute must not foster an excessive government entanglement. *See Lemon v. Kurtzman,* 403 U.S. 602, 612–613, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Courts, however, have also assessed common law rights in light of the Establishment Clause prohibition against "excessive entanglement", although not using the traditional three-part test fashioned by the Supreme Court in *Lemon* for the analysis of statutes. *See Gargano,* 80 F.3d at 90 (breach of contract claim); *Minker v. Baltimore Annual Conference of the United Methodist Church,* 894 F.2d 1354, 1360 (D.C.Cir.1990) (oral contract claim).

ployment dispute does not require the Court to address questions concerning the validity or plausibility of religious beliefs or choose between competing views of religious doctrine, improper government entanglement does not occur because the decision that is ultimately reached implies nothing about the validity or plausibility of religious doctrine *See Geary,* 7 F.3d at 327 (quoting *N.L.R.B. v. Catholic Bishop of Chicago,* 440 U.S. 490, 502, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979); *see also Scharon v. St. Luke's Episcopal Presbyterian Hosp.,* 929 F.2d 360, 363 (8th Cir.1991)); *Minker v. Baltimore Annual Conference of United Methodist Church,* 894 F.2d 1354, 1356–57 (D.C.Cir.1990). *Accord, DeMarco,* 4 F.3d at 171.

The Second Circuit recently addressed the issue of government entanglement in matters of religion, holding that, notwithstanding the general prohibition, "[t]he First Amendment does not prevent courts from deciding secular civil disputes involving religious institutions when and for the reason that they require reference to religious matters." *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.,* 196 F.3d 409, 431 (2d Cir.1999) (citing *Jones v. Wolf,* 443 U.S. 595, 603, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979)). Although First Amendment values are implicated when resolution of the case turns upon interpretations of religious doctrine and practice, if the district court does not make a decision for or against any religious doctrine or practice, then this proscription of the First Amendment is not violated. *Martinelli,* 196 F.3d at 431 (citing *Presbyterian Church in the U.S. v. Hull Memorial Presbyterian Church,* 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969)). The party asserting that the Court is prohibited from exercising jurisdiction over a case must "point to a disputed religious issue which the jury or the district judge in [the] case [would be] asked to resolve." *See e.g., Martinelli,* 196 F.3d at 431. *Compare Bollard,* 196 F.3d at 946 (the Free Exercise Clause is offended if the church is asked to articulate a religious justification for a particular decision). The Court must distinguish between religious principles as facts as opposed to making a decision that a particular religious principle is valid. *Martinelli,* 196 F.3d at 431.

In *Martinelli* a former parishioner claimed that the defendant diocese of Bridgeport had breached its fiduciary duty to him in connection with the sexual abuse he was subjected to by a priest of the diocese. Following a plaintiff's verdict, the diocese appealed arguing, *inter alia,* that the district court erred when it concluded that the First Amendment did not prohibit it from finding that a fiduciary duty existed between the plaintiff and the diocese. *Martinelli,* 196 F.3d at 430. The diocese argued that during the course of the trial evidence was improperly admitted relating to various teachings of the Roman Catholic church and the status and responsibilities of a bishop under canon law. *Id.* The diocese further argued that the district court unconstitutionally relied upon its own interpretation of canon law in ruling on the defendant's Fed.R.Civ.P. 50(b) motion when it determined that the diocese owed its parishioners a fiduciary duty. *Id.*

The Second Circuit rejected these arguments and concluded that the First Amendment had not been violated because neither the jury or the court was forced to choose between competing interpretations of religious doctrine or practice. *Id.* at 431. The court stated that

> Where a person's beliefs are alleged to give rise to a special legal relationship between him and his church, we may be required to consider with other relevant evidence the nature of that person's beliefs in order properly to determine whether the asserted relationship in fact exists. In doing so, we judge nothing to be heresy, support no dogma, and acknowledge no beliefs or practices of any sect to be the law.

*Id.* at 431. The Second Circuit recognized that a district court may inquire into whether a particular belief is held without

determining whether that belief is supported by the law of the Catholic Church.[17]

The conclusion reached by the Second Circuit in *Martinelli* follows its reasoning in *Gargano* and *DeMarco*. In *Gargano*, the plaintiff had been a second grade teacher at a Catholic parochial school for many years when the church opened a new parochial school and she applied for a teaching position there. When she was not offered the job, she sued the church for violation of the ADEA and for breach of contract. *Gargano*, 80 F.3d at 88–89. The church claimed that one of the reasons that it decided not to offer the plaintiff the position was that she did not adequately prepare her students for the sacraments in her former teaching position. *Id.* at 90. The jury returned a verdict in favor of the plaintiff on the breach of contract claim.

On appeal, the church argued that the judgment should be vacated because the trial permitted improper government entanglement with religion. Specifically, the church argued that the district court violated the Establishment Clause by permitting the jury to consider the merits of the church's claimed religious reason for the employment decision. *Id.* The Second Circuit rejected the church's Establishment Clause argument, concluding that "state employment contract law generally requires little intrusion into the functioning of religious institutions" and evaluating the church's alleged religious motive for not hiring the plaintiff did not put "into issue the validity or truthfulness of Catholic religious teaching." *Id.*

In *DeMarco*, the plaintiff was a mathematics teacher at a Catholic high school. After five years of employment with the school, the plaintiff was advised that his contract would not be renewed for the following year. The plaintiff brought an ADEA action against the school and the school moved for summary judgment, arguing that the plaintiff had been dismissed for religious reasons unrelated to his age. The school claimed that the plaintiff had been dismissed because he failed to begin class each day with prayer and because he failed to attend mass with his students. The school also argued that it was statutorily exempt from the provisions of the ADEA because of its religious status. The district court agreed with this statutory argument and granted summary judgment in favor of the school, holding that the ADEA could not be applied to employees with religious duties at parochial schools. *Id.*

The Second Circuit reversed and, in doing so, discussed the parameters of the Establishment Clause in the context of employment discrimination. The court recognized that the government was precluded from deciding the truth or validity of religious beliefs. *DeMarco*, 4 F.3d at 170. However, it disagreed with the district court's reasoning that "where employers proffered legitimate religious reasons for challenged employment actions, application of the *McDonnell–Douglas*[18] test would require 'recurrent inquiry as to the value or truthfulness of church doctrine,' thus giving rise to constitutional concerns." *DeMarco*, 4 F.3d at 170. (quoting *DeMarco v. Holy Cross High School,* 797 F.Supp. 1142, 1151–1152 (E.D.N.Y.1992)). The Second Circuit stated:

"[I]n applying the *McDonnell Douglas* test to determine whether an employer's putative purpose is a pretext, a factfinder need not, and indeed should not, evaluate whether a defendant's stated purpose is unwise or unreasonable. Rather, the inquiry is directed toward

---

17. The *Martinelli* court conducted this analysis in addressing the defendant's Free Exercise Clause argument. The reasoning, however, would appear to apply in considering the Establishment Clause arguments made by the parties here with respect to prohibited government entanglement.

18. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

determining whether the articulated purpose is the actual purpose for the challenged employment related action." *DeMarco*, 4 F.3d at 170–171 (citations omitted). The court noted that in ADEA or Title VII cases the plaintiff could call "into question the genuineness of the employer's putative non-discriminatory purpose by arguing that the stated purpose is implausible, absurd or unwise." *DeMarco*, 4 F.3d at 171 (citations omitted). The *DeMarco* court recognized "that such a plausibility inquiry could give rise to constitutional problems where ... a defendant proffers a religious purpose for a challenged employment action." *Id.* at 171. The *DeMarco* court concluded:

> However, this Establishment Clause concern does not lead us to hold that the ADEA does not apply to the case at bar. Rather, it requires us only to conclude that ADEA plaintiffs may not challenge the plausibility of putative religious purposes. A fact-finder will necessarily have to presume that an asserted religious motive is plausible in the sense that it is reasonably or validly held.

*Id. See also Geary*, 7 F.3d at 331 (although "any challenge to the validity or 'plausibility' of the religious reason" was barred by the First Amendment, plaintiff was free to offer evidence that similarly situated younger employees had not been terminated); *Drevlow v. Lutheran Church, Missouri Synod*, 991 F.2d 468, 472 (8th Cir.1993) (upon remand it was incumbent on the district court to limit the trial evidence to avoid deciding religious controversies); *Minker*, 894 F.2d at 1361 ("Appellant is entitled to prove up his claim of breach of an oral contract to the extent that he can divine a course clear of the Church's eccle-

siastical domain"). The *DeMarco* court went on to hold that at trial the jury would only be required to decide whether the plaintiff was fired because of his age or because of the proffered religious reason, and, therefore, the religious teaching would not be in issue. *Id.*

■ In sum, the cases hold that the Establishment Clause, like the Free Exercise Clause, does not shield all employment decisions by religiously-affiliated institutions from review. Rather, this Court is barred from adjudicating an employment dispute between a religiously-affiliated institution and one of its employees only where resolution of the dispute will require the Court or a jury to choose between competing religious views or interpretations of church doctrine or dogma in order to resolve the dispute.[19]

### 3. The Instant Case

#### a. Counts One through Three, Six, and Seven of Hartwig's Complaint

In the first count of his complaint, Hartwig alleges that he was fired because he is homosexual and because of the media attention on his teaching at the College resulting from *The Wanderer* articles and the op-ed piece in *The Dallas Morning News*. Hartwig claims, and the College does not deny, that as part of the employment agreement between them, the College agreed not to discriminate against Hartwig on the basis of his sexual orientation. Hartwig claims that the College's actions breached that agreement.

The College claims that (1) when Hartwig was hired he represented that he was on a permanent leave of absence, which meant that he was no longer a priest, (2)

---

**19.** This is one of the important distinctions between the Free Exercise Clause analysis and the Establishment Clause analysis which the Court must undertake: when undertaking the Establishment Clause analysis, the Court is required to conduct an examination of *what* the particular legal issues are in a given case and whether resolution of those issues will require the Court or the jury to choose be-

tween competing religious views or interpretations of church dogma. However, as previously discussed, when undertaking the Free Exercise Clause analysis, the Court is required to conduct an examination of *who* the aggrieved employee is at the center of the dispute and whether he has ministerial or secular duties and responsibilities.

Hartwig misrepresented himself as "a priest of the Dallas Diocese (now on leave)" in the op-ed piece he had written for *The Dallas Morning News* and provided to Dr. McNamara; and, (3) Hartwig's employment relationship with the College was terminated because priestly status is a matter of central concern in the Roman Catholic faith and Hartwig misrepresented his status when he stated he was still a priest.

Hartwig attacks the College's explanation for his termination in two ways. First, he argues that the College's claimed reason for his termination is pretextual because he had consistently described himself as a priest on leave from active ministry and the College only was concerned with his "priestly status" when it (and his homosexuality) became the focus of media attention. Second, he claims that the College's claimed religious reason for his termination is implausible because the teachings of the Roman Catholic Church or canon law do not support the College's position that Hartwig misrepresented his priestly status when he described himself as still a priest. Rather, Hartwig maintains that the teachings of the Roman Catholic Church or canon law support his contention that:

> ordination in the priesthood is permanent and that while one can be relieved of his faculties of ministry, he can not be relieved of his status as a priest.... His [Hartwig's] understanding of his status is that he is no longer active in the ministry, but he remains a priest.[20]

It is this second prong of Hartwig's attack on the College's explanation for terminating his employment which, on its face, appears to implicate the Establish-

ment Clause because it may involve deciding, under canon law, the status of a priest on a permanent leave of absence.

However, here, as in *Gargano* and *De-Marco*, the Court will not necessarily have to decide which of these two conflicting views is an accurate statement of the teachings of the Roman Catholic Church or canon law. In order to prove his claim of discrimination on the basis of sexual orientation in breach of his employment contract, the plaintiff is free to offer evidence that the College's proffered reason for his termination was pretextual and that the real reason for his termination was his sexual orientation and the related publicity.[21]

As in *DeMarco*, however, the plaintiff may not offer a conflicting interpretation of the teachings of the Roman Catholic Church or canon law to rebut the College's proffered religious reason for not renewing his contract. *See DeMarco*, 4 F.3d at 171; *see also Geary*, 7 F.3d at 330 At trial, the jury would be instructed that it should presume that the College's asserted religious motive was plausible. *See DeMarco*, 4 F.3d at 171. The jury will not have to choose between Hartwig's and the College's interpretation of ecclesiastical law. The College's view that one is no longer a priest when he takes a permanent leave of absence will be presumed correct. On this point, the jury will be instructed along the lines of:

> You are to presume that it was a reasonable or validly held conclusion of the defendants based on church doctrine that, by taking a permanent leave of

---

20. *See* Pl. Mem. in Opp. to Def. Mot. for Summ. J. at page 8.

21. The Court acknowledges that the plaintiff's claim of discrimination on the basis of sexual orientation is grounded in a contract with the College, not a state or federal anti-discrimination statute and that this analysis resembles that which is used when evaluating claims

under such statutes. However, given the nature of the contractual provision in question, the claims of the plaintiff and the defendants, the nature of the evidence offered by both of the parties, and the nature of the arguments made by of the both parties, it is apparent such an analysis is appropriately utilized here.

absence, one is no longer a priest of the Roman Catholic Church.[22]

The plaintiff is free to present evidence concerning the facts and circumstances surrounding his hiring, employment, and termination, but not a contrary view of the church doctrine stated here.

■ In endorsing this type of approach, the opinion in *DeMarco, supra,* also cautions that:

There may be cases involving lay employees in which the relationship between employee and employer is so pervasively religious that it is impossible to engage in an age-discrimination inquiry without serious risk of offending the Establishment Clause.

4 F.3d at 172. However, like *DeMarco,* this is not such a case. As pointed out at page 211–12 of this opinion, in discussing the application of the Free Exercise Clause and its ministerial exception, the record does not establish that Hartwig taught extensively in the area of Roman Catholic doctrine or that he provided spiritual services or counseling. As such, the employment relationship between Hartwig and the College does not give rise to claims and defenses in this action which are impermissibly religious in nature, because of pervasive religious involvement.

■ The College argues that its proffered reason for terminating Hartwig—his alleged misrepresentation that he is still a priest—cannot be evaluated without the Court weighing the importance of priestly status to a Roman Catholic College. As such, it is argued, the Court would violate the Establishment Clause.[23] However, both *Gargano* and *DeMarco* support the conclusion that this would not offend the First Amendment principles discussed in this opinion. Like in *Gargano,* where the fact finder was permitted to weigh as a factual matter the importance of preparing students to receive the sacraments, and in *DeMarco,* where the fact finder was permitted to weigh as a factual mat-

ter the importance of leading students in prayer and taking students to mass, when determining whether these considerations were the true reasons for the contested employment decisions, so too would the fact finder here be permitted to weigh the importance the College placed on "priestly status" in reaching its decision not to renew Hartwig's contract. This is because assessing the importance the College placed on "priestly status" in reaching the decision to terminate Hartwig does not involve a choice between competing versions of church doctrine.

In sum, the mere reference to a matter of religion does not bar this Court from hearing this case under the First Amendment because the Court will not be forced to choose between conflicting interpretations of church law. Accordingly, this Court and the jury will not have to entangle itself in a matter of religion to resolve the first count of the complaint. Therefore, the College's Establishment Clause rights will not be violated.

For the same reasons, the Court and the jury will not have to entangle itself in a matter of religion to resolve counts two, three, six, and seven. Count two alleges that by not renewing his contract, the College breached its agreement to allow Hartwig academic freedom. Count three alleges that the College breached its agreement to follow certain procedures when determining whether to reappoint Hartwig. Count six alleges that Dr. McNamara tortiously interfered with Hartwig's business contract with the College when she caused the termination of his administrative and teaching duties. Count seven alleges that both defendants intentionally inflicted emotional distress on Hartwig through their actions which concluded with his termination. As with count one, the resolution of these counts will not require the Court to inquire into competing interpretations of church law or policy. Rather, the

---

22. The parties will be permitted to submit requests to charge on this issue at trial.

23. Presumably, this would be presented by the College to counter the claim of pretext.

central issue for each of them is whether Hartwig was discharged for the reason the College has stated: his alleged misrepresentation of his priestly status. If conducted in the manner described above with respect to count one, resolution of counts two, three, six, and seven, will not result in the Court or the jury having to struggle issues of religious doctrine. As with count one, Hartwig will not be given the opportunity to offer an interpretation of the teachings of the Roman Catholic church or canon law which conflicts with the one the College claims to have based its decision upon.

### b. Hartwig's Defamation Counts

 In counts four and five Hartwig claims that the defendants defamed him by publicly stating that he had been terminated because he had misrepresented his priestly status. Unlike Hartwig's other causes of action, these claims will require a trier of fact to choose between two conflicting ecclesiastical definitions of the term "priest" and thus would violate the Establishment Clause.

 To prove defamation under Connecticut common law, a plaintiff must establish that the defendant published false statements about him. *See Daley v. Aetna Life and Casualty Co.,* 249 Conn. 766, 794, 734 A.2d 112 (1999) (citing *Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.,* 234 Conn. 1, 27, 662 A.2d 89 (1995)); *see also Kelley v. Bonney,* 221 Conn. 549, 563, 606 A.2d 693 (1992); *Lizotte v. Welker,* 45 Conn.Supp. 217, 709 A.2d 50, 54 (1996). Where the statement concerns the plaintiff's personal reputation, the truth of the allegedly defamatory statement of fact provides an absolute defense to defamation. *Goodrich v. Water-*

bury *Republican–American, Inc.,* 188 Conn. 107, 112, 448 A.2d 1317 (1982). The existence of that element of falsity for these causes of action and the assertion of the "truth" defense compels a conclusion under the Court's Establishment Clause analysis different than the one reached with respect to the other counts of the complaint.

In *Klagsbrun v. Va'ad Harabonim of Greater Monsey,* 53 F.Supp.2d 732 (D.N.J. 1999), the plaintiff was an Orthodox Jew accused by religious leaders of bigamy and failing to obtain a religious divorce from his wife prior to remarrying. *See Klagsbrun,* 53 F.Supp.2d at 734–736. The plaintiff brought an action against the rabbinical board who sanctioned him, the board's individual members, and his wife, alleging slander and libel.[24] The defendants moved to dismiss, arguing that to determine the truth or falsity of their alleged statements, the court would have to "delve into questions of doctrine and faith," and, therefore, the court lacked jurisdiction over this ecclesiastical dispute under the Free Exercise Clause. *See Klagsbrun,* 53 F.Supp.2d at 739.

The district court considered the elements of slander and libel under New Jersey common law and agreed that it would have to determine whether the plaintiff had engaged in bigamy in violation of the Orthodox Jewish faith. *Id.* at 741. The Court concluded that "an inquiry into the truth or falsity of the defendant's statement concerning Seymor Klagsbrun's alleged bigamy would entail judicial intrusion into ecclesiastical doctrine and practice...." *Id.*

In the instant case, Hartwig claims that the defendants committed the torts of defamation[25] and libel when they stated to

---

**24.** The court applied New Jersey common law to the slander and libel claims. *See* 53 F.Supp.2d at 737.

**25.** It is unclear from the plaintiff's complaint as to what particular cause of action he has alleged under his "defamation" count, because defamation includes the torts of libel

and slander. *See Lizotte v. Welker,* 45 Conn. Supp. 217, 709 A.2d 50, 54 (1996) (quoting W. Prosser & W. Keeton, Torts (5th Ed.1984) § 111, p. 771); *see also Charles Parker Co. v. Silver City Crystal Co.,* 142 Conn. 605, 611–12, 116 A.2d 440 (1955). The distinction, howev-

the press and the public that he had misrepresented his priestly status. He asserts that the statements were false because, he argues, canon law supports the position that once ordained as a Roman Catholic priest he remains such for life.

The defendants assert as an affirmative defense that the statements they made concerning Hartwig's priestly status were, in fact, true. They base this defense on their interpretation of canon law as it relates to priestly status. Specifically, they claim that under canon law, the church does not recognize the clerical status of being a priest "on leave from the active ministry;" rather, Hartwig ceased to be a priest when he took permanent leave. Therefore, they argue, they stated the truth when they made public statements to the effect that Hartwig had misrepresented his clerical status.

As was the case in *Klagsbrun*, in order to adjudicate these claims, the Court or the jury would have to determine the truth of the defendants' statements concerning Hartwig's priestly status and, in doing so, would examine and weigh competing views of church doctrine. This would result in the Court entangling itself in a matter of ecclesiastical concern, thereby violating the Establishment Clause. Accordingly, counts four and five are barred from review by this Court.

## C. Summary of the Court's First Amendment Ruling

In sum, the Court concludes:(1) at this time the record does not establish that Hartwig performed ministerial or pastoral duties for the College. Thus, his claims are not barred by the First Amendment's Free Exercise Clause; (2) with the exception of his defamation and libel claims (counts four and five) the record does not establish at this time that adjudication of Hartwig's common law causes of action will result in the court entangling itself in religious matters, as prohibited by the Establishment Clause; and, (3) with respect

to Hartwig's defamation and libel claims, the Court concludes that adjudication of those claims would require the Court to entangle itself in matters of religion and, therefore, summary judgment shall enter in favor of the defendants as to those claims.

## D. Issues of Material Fact

The defendants have raised various challenges to counts one through three, six, and seven, in addition to their First Amendment arguments. However, as to these counts, the Court concludes that there exist disputed issues of material fact, including, but not limited to the following: (1) whether the defendants' actions breached various provisions of Hartwig's contract; (2) whether Hartwig's employment was terminated because of his sexual orientation and/or publicity concerning his sexual orientation; (3) how Hartwig described his priestly status during his initial employment interview and during his term of employment at the College; (4) whether the defendants intentionally inflicted emotional distress on Hartwig; (5) whether Dr. McNamara acted in bad faith, outside the legitimate scope of her employment, and/or engaged in wilful misconduct with respect to the termination of the plaintiff's employment; and, (6) whether Dr. McNamara tortiously interfered with Hartwig's employment relationship with the College.

## Conclusion

The defendants' motion for summary judgment [doc. # 20] is **GRANTED IN PART AND DENIED IN PART**. The motion is granted on Establishment Clause grounds as to counts four and five, and denied as to the remaining counts of the complaint.

er, is irrelevant to the Court's Establishment Clause analysis.